UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

HAMILTON PRODUCTS, INC.,

                Plaintiff,

-vs-                                    Case No.  5:05-cv-455-Oc-10GRJ

MICHAEL C. O'NEILL, d/b/a DESIGN
SOLUTIONS, LTD.,

                Defendant.

_____/

# O R D E R

      This action concerning United States Patent No. 6,834,621 B1 ("the '621 patent"),

and related confidentiality and licensing agreements, is before the Court for consideration

of the Plaintiff's Motion for Summary Judgment (Doc. 40), to which the pro se Defendant

has responded (Docs. 44 & 48).  The Defendant holds the '621 patent, which in general

terms describes a device designed to function as the equivalent of a seatbelt restraint for

pets in automobiles; the '621 patent is titled, "Animal Restraint System and Universal Seat

Buckle."  The claims of the '621 patent at issue involve the purportedly universal seatbelt

buckle that is an intrinsic part of the device.

      In its Complaint, the Plaintiff has purported to state eight claims against the

Defendant.  In six of those claims the Plaintiff seeks declaratory relief, and in two it seeks

damages for fraud and fraudulent misrepresentation.  However, the Plaintiff has moved for

summary judgment on only the first two claims in the Complaint and, accordingly, seeks

to have this Court declare that the patent at issue is invalid (Count I) or, failing that, seeks to have this Court declare that the Plaintiff has not infringed upon that patent (Count II). Upon review of the case file and all relevant papers, and for the reasons that follow, the Plaintiff's motion for summary judgment is due to be granted because the '621 patent is invalid as indefinite and because the claimed invention was obvious.  The patent being invalid, no infringement has occurred.

## Background and Facts

a.    The Parties

The Plaintiff, Hamilton Products, Inc. ("Hamilton"),a Michigan corporation with its principal place of business in Ocala, Florida, designs and manufactures pet related products, including collars and leashes.

The Defendant, Michael C. O'Neill ("O'Neill"), a Georgia resident, is the holder of the '621 patent.   O'Neill's educational background includes a high school diploma, the completion of a three-year "apprentice all-around machinist program" at General Electric Company,[1] the completion of a few years of evening college courses studying business and economics at Suffolk University in Boston[2], and a certificate as a certified computer engineer from Microsoft.[3]  Other than positions in sales and marketing, O'Neill has served

_____

[1] February 20, 2007 deposition of O'Neill at 22.

[2] February 20, 2007 deposition of O'Neill at 25.

[3] February 20, 2007 deposition of O'Neill at 26.

as a "quality control engineer"[4] at General Electric and a "computer systems engineer"[5] at another company.

In approximately August of 2001, O'Neill filed invention disclosure documents with the United States Patent And Trademark Office ("USPTO") concerning a product the concept of which would come to be the subject of the '621 patent.[6]  In September 2001, O'Neill approached Hamilton with that concept.  After Hamilton signed a non-disclosure agreement, O'Neill provided Hamilton with a PowerPoint computer presentation that described an "automobile animal restraint" with a "universal buckle."  O'Neill asserted in the presentation that the "Universal buckle is the result of the considering dimensions [sic] of all auto manufacturer's buckle designs."  The presentation contained a drawing of the universal buckle, and instead of specifying the dimensions of the buckle, the terms "minimum width," "minimum length," and "maximum slot length and width" were inserted. In addition, the presentation contained a warning that O'Neill had "filed Invention Disclosure Document Statements with the USPTO."

After presenting the PowerPoint demonstration, O'Neill began discussions with Hamilton representatives and eventually provided them with dimensions to create the universal buckle portion of his product.  O'Neill never provided Hamilton with a prototype

---

[4] February 20, 2007 deposition of O'Neill at 21.

[5] February 20, 2007 deposition of O'Neill at 18.

[6] February 20, 2007 deposition of O'Neill at 32.  These initial documents are not contained in the record before the Court.

buckle and the dimensions that were transmitted to Hamilton are not in the record before the Court.  In any event, Hamilton attempted to verify that the universal buckle was, actually, universal, and immediately determined that the buckle was not compatible with every make or model of vehicle.  The buckle especially was not compatible with vehicles made prior to the mid-1990s.  When Hamilton contacted O'Neill to discuss the fit issues, O'Neill allegedly informed Hamilton that he was a designer and not an engineer, and that Hamilton needed to make the product work.  However, it is undisputed that O'Neill stated to Hamilton that he did not believe that one buckle could fit both vehicles currently in production and those produced prior to the mid-1990s due to a significant industry-wide change in how seat-belt buckles were designed during that period.  After discussions with O'Neill, Hamilton employees, who were not engineers but had some experience with manufacturing and machine-shop tools, engaged in a few weeks of "tinkering" until they were satisfied with the concept of a universal buckle.

In late 2001, Hamilton and O'Neill signed a licensing agreement for O'Neill's product conception.  Shortly thereafter, Hamilton began producing a product similar in design to that in O'Neill's PowerPoint presentation.  The product actually sold by Hamilton contained two buckles, one with a long and narrow shape and intended for use with newer vehicles, and one with a shorter and wider shape, for use with vehicles produced prior to the mid-1990s.[7]  In 2002, the product sold by Hamilton received an award as the best new product

---

[7] O'Neill has asserted in his deposition that only the long and narrow buckle infringes
(continued...)

4

of 2002 at a pet products trade show.  After a few years, O'Neill cancelled the licensing agreement with Hamilton.  O'Neill asserted that Hamilton had not honored the terms of the agreement, primarily by failing to pay royalties.  Hamilton continued to sell its product for two more years.  However, due to purported lagging sales and fit problems indicating a lack of true universality, Hamilton withdrew the product from the market.[8]

    b.   Procedural History

On November 11, 2005, Hamilton filed the Complaint, in which Hamilton purported to state eight claims against O'Neill.[9]  In Counts I through VI, Hamilton seeks declarations from the Court and in Counts VII and VIII, Hamilton seeks damages for fraud and false representations.  In Count I, Hamilton seeks a declaration that the '621 patent is invalid. In Count II, Hamilton seeks a declaration that no product it has ever sold infringes upon the '621 patent.  In Counts III through VI, Hamilton seeks declarations that the confidentiality and licensing agreements it signed were void and, if valid, that Hamilton did not breach those agreements.  However, Hamilton has moved for summary judgment only on Counts I and II.  Accordingly, despite the parties' extended discussions concerning improprieties, the alleged fraud, and breach of the various agreements, the Court will limit its analysis to the patent issues at hand.

_____

[7](...continued)
his patent. February 20, 2007 deposition of O'Neill at 64.

[8] See Affidavit of Ilona Thompson; September 26, 2006 Deposition of Bill Priest at 30-31.

[9] Prior to Hamilton filing of this case, O'Neill filed an action in state court against Hamilton concerning the alleged breach of the licensing agreement.  That case is currently pending.

c.    Prosecution of the '621 Patent

United States Patent No. 6,834,621 B1 ("the '621 patent"), which was issued on December 28, 2004, is titled "Animal Restraint System and Universal Seat Buckle" and contains thirty-six claims.  Specifically, in claims 1, 12, 19, 21, 25, 28 and 35 (all of the independent claims) O'Neill - who was represented by counsel during the patent prosecution - specifies dimensions of the tongue and slot portions of the purportedly universal seat buckle.  In pertinent part, those claims read as follows:

1. An animal restraint system for securing an animal in a vehicle comprising: . . . a buckle for coupling to an automotive seat belt keeper, the buckle being carried by the tether and disposed between the length adjustor and the second end , wherein the buckle comprises a tether restraint section through which the tether is inserted, and wherein the buckle further comprises a tongue section extending from the tether restraint section, the tongue section having a slot formed therein, the tongue section having a thickness of less than approximately 0.13", an overall width of less than approximately 0.8", and a front wall portion having a width of less than approximately 0.23" the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

* * *

12. An animal restraint system for securing an animal in a vehicle comprising: . . . a buckle for coupling to a automotive seat belt keeper, the buckle being coupled to the loop, wherein the buckle further comprises a tongue section extending from a tether restraint section of the buckle, the tongue section having a slot formed therein, the tongue section having a thickness of less than approximately 0.13", an overall width of less than approximately 0.8", and a front wall portion having a width of less than approximately 0.23" the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

* * *

19. An animal restraint system for securing an animal in a vehicle comprising: . . . a length adjuster having an opening through which a portion of the tether is inserted, the length adjuster forming a loop for restraining the buckle, wherein the tongue

section having a thickness of less than approximately 0.13", an overall width of less than approximately 0.8", and a front wall portion having a width of less than approximately 0.23" the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

* * *

21. A buckle being mateable with a plurality of vehicle restraint system keepers comprising: . . . a tongue section extending from the tether restraint section, the tongue having a slot formed therein; the tongue having an overall width of less than approximately 0.8", a thickness of less than approximately 0.13", and a front wall portion having a width of less than approximately 0.23"; the slot having an overall width of greater than approximately 0.52"[[10]] and a length of greater than approximately 0.99".

* * *

25. A buckle comprising: . . . a tongue section coupled to the tether restraining section, the tongue section having a slot formed therein, the tongue section having a thickness of less than approximately 0.13", an overall width of less than approximately 0.8", and a front wall portion having a width of less than approximately 0.23", the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

* * *

28. An animal restraining system for securing an animal in a vehicle comprising: . . . a buckle having a tongue section for coupling to an automotive seat belt keeper and a tether restraint section, the tether restraint section having generally parallel first and second closed-sided openings through which a tether may be inserted and removably retained therewith, and resist accidental dislodgement as a function of the first and second closed-sided openings, wherein the tongue section has a slot formed therein, the tongue section having a thickness of less than approximately 0.13", an overall width of less than approximately 0.8", and a front wall portion having a width of less than approximately 0.23" the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

---

[10] It appears that this measurement is a typographical error, the measurement is listed as 0.53" in all the other independent claims in the '621 patent.

* * *

35. A method of converting a pet leash with a clasp at a first end and a loop at a second end into a pet restraint system comprising: . . . wherein the tongue section has a slot formed therein, the tongue section having a thickness of less than approximately 0.13", an overall width of less that approximately 0.8", and a front wall portion having a width of less than approximately 0.23" the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

United States Patent No. 6,834,621 B1 (December 28, 2004).

On October 22, 2002 O'Neill filed the patent application for the '621 patent with the USPTO.  In an information disclosure statement filed with the patent application, O'Neill listed several instances of prior art, including the Snyder patent (No. 5,514,660, issued October 13, 1992).

In an office action dated July 10, 2003, the USPTO rejected several of the claims in the '621 patent as being anticipated by Ellwanger (No. 4,941,434).  In that office action, the examiner stated that: "In consideration of the precise measurements given of the thickness of the tongue 2, slot, and buckle 1, these measurements are considered to make the buckle of a size to fit most standard seat belt keepers today, the buckle of Ellwanger is also designed to fit most standard seat belt keepers . . . ."

On November 10, 2003, O'Neill filed a response to the office action, in which he provided amendments to his original application as well as responses concerning the rejection of his claims.  Those remarks included the following explanation of the buckle dimensions contained in the '621 patent and the purported differences between it and Ellwanger:

8

With specific reference to Independent Claims 22 and 25 [11], and the recitation of buckle measurements therein, Examiner bases her rejection on Ellwanger's disclosure of a "universal buckle designed to fit almost all of the automobile and truck seatbelts manufactured today."  In response thereto, Applicant respectfully asserts that a mere assertion of universality of a device does not make it so. Applicant further asserts that an assertion or disclosure of a "universal buckle" without any teaching of dimensions and/or implementation is completely non-enabling, especially in view of the vast number of automakers in the United States alone (i.e., over thirty makes of passenger vehicles, each offering several models). Since each keeper is uniquely mateable with the buckles of a vehicle seatbelt system, and in particular a certain buckle within the vehicle, the keeper and the buckle are a unique mateable set having dimensions for mating only with a keeper for a particular make and model.  Additionally, and in view of the Ellwanger patent filing date of 1988 (i.e., over 1½ decades ago to date), significant advancements in seatbelt design technology have been made that render the Ellwanger assertion of "universal fit amongst seatbelts of today" largely inaccurate, inapplicable, and non-enabling.

Applicant has invested significant time and expense in the statistical evaluation, survey, experimentation, analysis, study, and manufacture of a truly enabling "universal seatbelt buckle"; the universally applicable dimensions of which are recited in Applicant's specifications and claims.  Applicant respectfully directs Examiner's attention to the appended statistical and comparative evidence establishing the survey, tests and comparative analysis conducted by Applicant to

---

[11] Claim 22 in the original application read, in pertinent part, as follows:

a tongue section extended from the tether restraining section, the tongue section having a slot formed therein, the tongue section having an overall width of less that approximately 0.8", a thickness of less than 0.13", and a front wall portion having a width of less than approximately 0.23"; the slot having an overall width of greater than approximately 0.52" and a length of greater than approximately 0.99".

Claim 25 in the original application read, in pertinent part, as follows:

a tongue section coupled to the tether restraining section, the tongue section having a slot formed therein, the tongue section having a thickness of less than 0.13", an overall width of less that approximately 0.8", and a front wall portion having a width of less than approximately 0.23"; the slot having an overall width of greater than approximately 0.53" and a length of greater than approximately 0.99".

identify and invent a buckle with appropriate dimensions to yield Applicant's enabling universal buckle (See Exhibit A, supported by Affidavit of Applicant Michael C. O'Neill pursuant to 37 C.F.R. 1.132).  Upon review of Exhibit A, Examiner will find a spreadsheet entitled "Auto Manufacturer Buckle Dimensions", in which Applicant has compiled the six critical buckle dimensions from a multitude of automakers, wherein such comparative dimensional analysis was utilized by Applicant to construct his universal buckle.  Examiner will further find a document entitled "Target Auto Selection for PoochPal", in which Applicant details a multitude of auto dealers and their respective addresses, wherein, during development of Applicant's universal buckle, Applicant traveled to each said auto dealer to take actual measurements of buckles in the various vehicle makes and models offered thereby.

Appellant respectfully believes that the attached statistical and comparative evidence in Exhibit A distinguishes Applicant's device as claimed in Claims 22 and 25 from that of Ellwanger, and further provides the requisite proof to buttress Applicant's enabling patent disclosure and assertion of a truly universal buckle.

O'Neill's November 10, 2003 Response to Office Action.

As noted in that response, O'Neill attached his own affidavit, in which he explained the method and process by which he calculated the dimensions of the tongue and slot of the "universal" buckle described in the '621 patent.  Specifically, O'Neill recited that he measured the buckles of then-new vehicles from eight different manufacturers and "identified the required configuration to create a universal fit buckle."  According to O'Neill: "This included considering the overall tongue width from all dimensions; the maximum slot width from all manufacturer's designs, the maximum tongue length from all buckle dimensions, and the minimum front wall (end) length from all designs."  After creating a buckle based upon those maximum and minimum dimensions, O'Neill verified that the buckle fit all of the then-new vehicles from which he had taken measurements.

On April 13, 2004, the USPTO again rejected several of O'Neill's claims in the '621 patent as being anticipated by Ellwanger.  Just as in November of the prior year, the examiner stated that: "In consideration of the precise measurements given of the thickness of the tongue 2, slot, and buckle 1, these measurements are considered to make the buckle of a size to fit most standard seat belt keepers today, the buckle of Ellwanger is also designed to fit most standard seat belt keepers . . . ."  On July 7, 2004, O'Neill responded to the office action by amending his application.  Specifically, O'Neill added the dimensions, which contained numeric values, previously contained in claims 22 and 25 to the newly numbered claims 1, 12, 19, 21, 25, 28 and 35.  On December 28, 2004, the USPTO issued the '621 patent to O'Neill.  There is no evidence in the record of any communication between O'Neill and the USPTO during the period from July 7, 2004 to the issuance of the '621 patent.

Recently, O'Neill applied for re-issuance of the '621 patent.  In the re-issuance application, O'Neill seeks to patent not a buckle containing particular dimensions, but a method for creating a "universal" buckle.[12]  As such, the re-issuance application does not contain the dimensional limitations contained in claims 1, 12, 19, 21, 25, 28 and 35 of the '621 patent.

---

[12] February 20, 2007 deposition of O'Neill at 110.  The re-issuance application is not in the record before the Court.

11

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Moreover, conclusory allegations and unwarranted deductions of fact are not accepted as true.  See Eidson v. Arenas, 837 F. Supp. 1158, 1160 (M.D. Fla. 1993).

**Discussion**

A.    35 U.S.C. § 112 - Definiteness

Every patent's specification must "conclude with one or more claims particularly

pointing out and distinctly claiming the subject matter which the applicant regards as his

invention."   35 U.S.C. § 112, ¶ 2.   The Federal Circuit has stated the standard for

assessing whether a patent claim is sufficiently definite to satisfy the statutory requirement

as follows: "If one skilled in the art would understand the bounds of the claim when read

in light of the specification, then the claim satisfies section 112, paragraph 2."  Exxon

Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (citing Miles

Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed. Cir. 1993)).  "Because the claims

perform the fundamental function of delineating the scope of the invention, the purpose of

the definiteness requirement is to ensure that the claims delineate the scope of the

invention using language that adequately notifies the public of the patentee's right to

exclude."  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).

"The statutory requirement of particularity and distinctness in claims is met only when [the

claims] clearly distinguish what is claimed from what went before in the art and clearly

circumscribe what is foreclosed from future enterprise."   United Carbon Co. v. Binney &

Smith Co., 317 U.S. 228, 236 (1942); see Morton Int'l, Inc. v. Cardinal Chem. Co., 5 F.3d

1464, 1470 (Fed. Cir. 1993) (claims must be "sufficiently precise to permit a potential

competitor to determine whether or not he is infringing").

However, absolute clarity is not required, and only claims "not amenable to construction" or "insolubly ambiguous" are indefinite.  See Datamize, LLC, 417 F.3d at 1347; Novo Indus., LP v. Micro Molds Corp., 350 F.3d 1348, 1353 (Fed. Cir. 2003); Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003); Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Further, an issued patent enjoys a statutory presumption of validity, and clear and convincing evidence must be shown to invalidate a patent.  See 35 U.S.C. § 282; Datamize, LLC, 417 F.3d at 1347-48; Budde v. Harley Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001).  "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of validity."  Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

"In the face of an allegation of indefiniteness, general principles of claim construction apply."  Datamize, LLC, 417 F.3d at 1348.  Indeed, "the determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  Personalized Media Comm., LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998).  "Intrinsic evidence in the form of the patent specification and file history should guide a court toward an acceptable claim construction."  See Datamize, LLC, 417 F.3d at 1348.  Specifically, the court should consider the patent's prosecution history, which may reveal "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005).  In addition, a court considering an allegation

of indefiniteness may rely on extrinsic evidence when construing the claims at issue. Datamize, LLC, 417 F.3d at 1348.  Such extrinsic evidence may include "all evidence external to the patent, including expert and inventor testimony, dictionaries, and learned treatises." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995).

Here, the language in the '621 patent claimed as indefinite by Hamilton is that describing the numeric value of the dimensions of the slot and tongue of the purportedly universal buckle.  Specifically, Hamilton contends that those dimensions are indefinite because each numeric value is proceeded by modifying language that makes it so ambiguous as to prevent one skilled in the art from determining the scope of the '621 patent.  The language in the claims at issue is the following:

> the tongue section having a thickness of **less than approximately** 0.13", an overall width of **less than approximately** 0.8", and a front wall portion having a width of **less than approximately** 0.23" the slot having an overall width of **greater than approximately** 0.53" and a length of **greater than approximately** 0.99".

Claim 1 of the '621 patent.  That language is present claims 1, 12, 19, 21, 25, 28 and 35 - all of the independent claims.  Hamilton asserts that the use of the modifiers "less than approximately" and "greater than approximately" in those claims is vague, imprecise and internally inconsistent.

Looking first to the intrinsic evidence, the Court is unable to determine what numeric values would fall within the scope of the dimensions specified in the patent.  It is clear from

the patent prosecution history that O'Neill sought to distinguish his buckle from Ellwanger on the basis that Ellwanger merely taught a "universal buckle designed to fit almost all of the automobile and truck seatbelts manufactured today" and the '621 patent actually taught the numeric values of the dimensions necessary to achieve universality.   However, O'Neill's argument that "a mere assertion of universality of a device does not make it so" applies equally to the '621 patent; the mere assertion that certain dimensions achieve universality does not make it so.   Especially, here, where the dimensions specified in the claims themselves belie a clear determination of their numeric values.   Moreover, the only true limitation to the dimensions specified in the '621 patent and the prosecution history is that those dimensions be within a range to allow universality.   Because the Court cannot construe the numeric value of the dimensions of the tongue and slot of the purportedly universal buckle described in the '621 patent by looking solely to the intrinsic evidence, the Court must look to the extrinsic evidence.

A primary piece of extrinsic evidence before the Court is the testimony of the inventor himself.   During O'Neill's deposition, Hamilton's counsel attempted to ascertain the numeric value of the outer boundaries of the dimensions in the independent claims.   For example, counsel asked Hamilton whether a buckle with a tongue section of an overall width of 0.848" would fall within the claim language of "an overall width of less than approximately 0.8."   O'Neill replied that it would.   In fact, O'Neill replied that any measurement that would

not cause fit failure would fall within the claims of the patent.[13]  Hamilton testified that: "On

this device it is the function that is critical.  It has to perform its intended function once its

put into the female receiver.  For this device the dimensions are actually non-critical as long

as the device performs the way its intended to perform."[14]  O'Neill went on to explain that:

"So the wording approximately was used for a couple reasons.  One, to prevent or

discourage somebody from attempting to design around by changing the dimension by

several thousandths or even a few tenths - hundredths rather, but also to allow for normal

manufacturing tolerances."[15]  Finally, the following exchange took place:

> Q:     What I want to find out is when you use the term with respect to tongue width
> less than approximately 0.8 inches, how far does that go on either side?
> Where is the proper line?
>
> A:     I guess, David, it doesn't really set a line.  There is, when you're dealing with
> tolerances, you know, a tolerance would have to be defined because I had no
> belief manufacturers would tell me the design and dimensioning and the
> tolerancing of their systems, assuming that they would consider that
> proprietary in nature.  I had to design a male to fit all manufacturers' buckles,
> and when I say all, just for the record, I'm talking the narrower design in figure
> Exhibit 2, the lower photograph, the narrow design.[[16]] But, you know, the

---

[13] February 20, 2007 deposition of O'Neill at 89.

[14] February 20, 2007 deposition of O'Neill at 89.

[15] February 20, 2007 deposition of O'Neill at 89.

[16]  The product actually sold by Hamilton contained two buckles, one with a long and narrow shape and intended for use with newer vehicles, and one with a shorter and wider shape, for use with vehicles produced prior to the mid-1990s.  At his deposition, Hamilton asserted that the '621 patent did not read on the shorter and wider buckle.  However, O'Neill did not otherwise limit the coverage of '621 patent, and did not explain that limitation or its numerical significance, other than to state that his patent was intended to read on seat belt buckles of vehicles produced prior to the

(continued...)

> word approximately is intended to again, because I don't know the manufacturers' dimensioning, I don't know what they use for tolerances, the word approximately is intended to allow tolerance and latitude in design, the key element being function, that when it is inserted into the female portion of the buckle system that it fits and functions as intended, okay?
>
> * * *
>
> Q:   With respect to less than approximately 0.8, how far in either direction can they go and not have their product be read upon by your patent claim limitation of less than approximately 0.8?
>
> A:   They could go to the point in either direction that it causes fit or function failure.

February 20, 2007 deposition of O'Neill at 96-97.  Accordingly, O'Neill's deposition does not assist the Court in construing or limiting the numeric value of the dimensions in the patent, other than limiting those dimensions to a mere assertion of universality.  Indeed, it appears that O'Neill has attempted to use assertions of numeric values in describing the dimensions of his buckle to achieve patentability over prior art, but also attempted to use the words "greater than approximately" and "less than approximately" to have his patent read on all universal buckles that function properly.  Further, to the extent that O'Neill has asserted that the term "approximately" is used to account for manufacturing tolerances, he has testified that he is unaware of what the limitations of those tolerances would be and has provided no evidence to establish the limitations of such tolerances.  Thus, that

----

[16](...continued)
mid-1990s.  Moreover, such a limitation is not contained in the intrinsic evidence.

explanation does not assist the Court in its determination of the definiteness of the '621 patent.

In addition to the testimony of O'Neill, the Court has before it the report of Hamilton's expert, Herbert Joe, M.A., J.D., LL.M.  Joe gives the opinion that the '621 patent is invalid as indefinite under § 112 based upon the use of the modifiers "greater than approximately" and "less than approximately."  Specifically, the expert explains his reasoning as follows:

> The points about the vagueness and internal inconsistencies of the words in the alleged O'Neill patent claims (and specification), and the variable imprecision in the measured values thereof are that they effectively invalidate the patent.  Specifically, because one or more claims includes a measure of a parameter and there is more than one method to measure that parameter, where the different methods of measurement achieve different results, the O'Neill claims are, in my opinion, invalid for indefiniteness under 35 U.S.C. § 112.[17]
>
> For example, in Claims 1, 12, 19, 21, 28 and 35 (all of Mr. O'Neill's independent claims), the tongue section is described as "having . . . an overall width of less than approximately 0.8", . . ." (italics added).
>
> * * *
>
> However, to give a measurement of "less than about (or approximately)" or "greater than about (or approximately)" is not intuitive, not common sense and can reasonably lead to different results.  For example, it is not illogical to conclude that (in our example with the 0.8" value) "less than about" 0.8" yields a measurement of 1) any value less than but not including 0.8" because of the phrase "less than" but without the phrase "or equal to", 2) any value less than or equal to 0.8" because of the phrase "less than" and the word "about", and 3) any value less than more or less than 0.8", including values just "greater than" 0.8" because a value greater than 0.8" gives import to the chosen word "about" (or approximately).  (However, to give

---

[17] [footnote in expert report]  Honeywell Int'l, Inc. v. Int'l Trade Comm'n, 341 F.3d 1332 (Fed. Cir. 2004).  However, if values encompassed by the claim language can be calculated or measured, so that the claim is not "insolubly ambiguous," the claim is not invalid for indefiniteness.  Marley Mouldings, Ltd. v. Mikron Indus., Inc., 417 F.3d 1356 (Fed. Cir. 2005).

import to the word "about" can mean more or less than 0.8" in this example, but then that would seem to vitiate the import of the "less than" the example value of 0.8".)

Herbert Joe Expert Report at 15-16.

Accordingly, Hamilton has succeeded in carrying its burden to establish by clear and convincing evidence that the '621 patent is indefinite. The dimensions of the '621 patent are insolubly ambiguous and incapable of construction by the Court. O'Neill did not meet the statutory requirement of particularity and distinctness in the claims of the '621 patent because those claims do not "clearly distinguish what is claimed from what went before in the art" and do not "clearly circumscribe what is foreclosed from future enterprise." United Carbon, 317 U.S. at 236; see Morton Int'l, 5 F.3d at 1470 (claims must be "sufficiently precise to permit a potential competitor to determine whether or not he is infringing").

This case is distinguishable from Ortho-McNeil Pharm., Inc. v. Kali Labs., Inc., – F. Supp. 2d –, 2007 WL 1071940 (D.N.J. April 5, 2007), in which the court construed "about 1:5" to encompass the specific numerical range of 1:3.6 to 1:7.1. In Kali, the court was able to definitely construe that numerical range because the specification in the patent read over a ratio of the subject pharmaceutical mixture covering - in terms of efficacy - a 95% statistical confidence interval. Kali, 2007 WL 1071940; see Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs. Ltd., 476 F.3d 1321 (Fed. Cir. 2007). The patentee then presented expert extrinsic evidence that the term "about" encompassed the statistical variation of efficacy to that 95% confidence interval, an interval that experimentation showed consisted of a definite range of  ratios from 1:3.6 to 1:17.1. Kali, 2007 WL 1071940.   Here, the

specification of the '621 patent contains no benchmark similar to the 95% confidence interval present in Kali and O'Neill has presented this Court with no way to definitely gauge the numeric value of the dimensions of his universal buckle.  Moreover, the use of "less than approximately" and "greater than approximately" in the '621 patent adds a level of ambiguity not encountered by the Kali court, which simply interpreted the modifier "about."

Additionally, this case is distinguishable from Orthokinetics, Inc. v. Safety Chairs, Inc., 806 F.2d 1565 (Fed. Cir. 1986), in which the Federal Circuit found that a claim not invalid as indefinite that contained the following claim language of an orthopaedic chair for use in automobiles: "wherein said front leg portion is so dimensioned as to be insertable through the space between the doorframe of an automobile and one of the seats thereof." In Orthokinetics, the court reasoned that: "The phrase 'so dimensioned' is as accurate as the subject matter permits, automobiles being of various sizes.  As long as those skilled in the art realized that the dimensions could be easily obtained, § 112, 2d ¶ requires nothing more.  The patent law does not require that all possible lengths corresponding to the spaces in hundreds of different automobiles be listed in the patent, let alone that they be listed in the claims."  Id. at 1577.  That reasoning clearly indicates that the device in Orthokinetics would be manufactured in varying lengths depending upon the automobile in which the user of the device intended to place it.  In stark contrast, the universal buckle in the '621 patent was designed and intended for the explicit purpose of creating not multiple buckles of varying dimensions, but a single buckle that would fit universally in the female portion of any automobile seatbelt buckle.  In addition, the numeric values of the

dimensions in the '621 patent are particularly critical to its validity, because it is undisputed that those dimensions are what made it patentable.[18]   Indeed, if those dimensions read on any buckle that could be termed "universal", then they actually have no meaning.  As such, the patent is invalid as indefinite.

B.     35 U.S.C. § 103 - Obviousness

"A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000); see 35 U.S.C. § 103(a).  "Obviousness is a question of law based on underlying facts."  Cross Med. Prods., Inc. v. Medtronic Sofamar Danek, Inc., 424 F.3d 1293, 1302 (Fed. Cir. 2005).  "The factual determinations relevant to the obviousness inquiry include: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) secondary considerations, if any, such as commercial success, unexpected results, copying, long-felt but unresolved need, and the failure of others to develop the invention."  Syntex (U.S.A.) LLC v. Apotex, Inc., 407 F.3d 1371, 1378 (Fed. Cir. 2005) (quoting Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966)).

---

[18]   The only material difference between the '621 patent and the Snyder and Ellwanger patents is the inclusion in the '621 patent of the numeric values of the dimensions of the universal buckle.  See February 20, 2007 deposition of O'Neill at 161.  As the Court will explain in the next section, the '621 patent is invalid for obviousness because it is indistinguishable from the prior art, especially because the dimensions in the '621 patent are indefinite and may only be construed as a mere assertion of universality.

*i.      Scope and Content of Prior Art*

The scope of the prior art includes automobile seat belts and, particularly, universal seatbelt buckles and pet restraining devices.  The '621 patent's prosecution history makes note of several pieces of prior art and Hamilton's expert reveals a purportedly non-exhaustive list of prior art.  Specifically, Hamilton identifies and relies upon as prior art the Snyder patent, which was before the examiner during his consideration of the '621 patent. The Snyder patent teaches an automotive pet restraint system with the a buckle designed to be inserted into different types of seatbelt buckles.

*ii.      Difference Between the Claimed Invention and the Prior Art*

The undisputed evidence before the Court establishes that the only material difference between the '621 patent and the relevant prior art is the numeric values of the dimensions specified in the claims of the '621 patent.  When asked at his deposition what makes the device in the '621 patent different from the device in the Snyder patent, O'Neill stated that: "To differentiate that from the Snyder buckle, I would simply list the data that I acquired, the actual dimensions of the slots, the outside of the tongue, the wall dimensions and so on.  See what Snyder doesn't teach is that, you know, the reason it can't be universal is it doesn't teach how to attain universality"[19]  O'Neill went on to state that "the characteristics that make [the buckle in the '621 patent] universal are the

---

[19] February 20, 2007 deposition of O'Neill at 44-46.

dimensional features of the buckle . . . ."[20]  Later in his deposition, the following exchange took place:

> Q:     Okay.  So it was to achieve patentability that you've added the dimensional limitations to all you claims to get over things like Snyder?
>
> A:     To make it and show the uniqueness in the differentiation between my device and Snyder.
>
> Q:     That's right.  So, it is the dimension that differentiates your invention from Snyder and the rest of the prior claims?
>
> A:     Yes.

February 20, 2007 deposition of O'Neill at 161.  In addition, Hamilton's expert opined in his report that: "Theoretically and actually, the only difference between the claimed invention and the relevant prior art is in the measurements of the buckle that interfaces with the automotive seat belt system."  Herbert Joe Expert Report at 4.[21]

>    iii.    *Level of Ordinary Skill in the Art*

The evidence before the Court establishes that the level of ordinary skill in the art is low.  Indeed, the claimed differences between the '621 patent and the prior art are merely the dimensions of the "universal" buckle.  Further, it undisputed that O'Neill and Hamilton's employees had no experience designing or creating automotive seat belt buckles and had

---

[20] February 20, 2007 deposition of O'Neill at 44-46.

[21] In his deposition and in his response to the pending motion for summary judgment, O'Neill has asserted that an additional difference between the '621 patent and the Snyder patent is that Snyder taught the attachment of the tether containing the universal buckle and the pet using a "pinch clip" and the '621 patent taught the use of a swivel clip to effectuate that attachment.  The Court finds that asserted difference immaterial, the use of a swivel clip in place of a pinch clip is an obvious alteration of the Snyder patent.

only limited experience in general manufacturing and fabrication.  However, within a few weeks and despite their lack of experience, O'Neill and a handful of Hamilton employees each created their own version of the male portion of an automotive seat belt buckle that fit multiple makes and models of automobiles.  Indeed, patience and experimentation were the critical factors in creating a seatbelt buckle that fit multiple vehicles.

     *iv.    Secondary Considerations*

As to secondary considerations, O'Neill has claimed that a rash of copycat devices appeared shortly after he applied for his patent, and that the copying represented the uniqueness of his design and a long felt but unresolved need for such a product.  However, other than O'Neill's assertions, there is no evidence of such copying in the record before the Court.  By contrast, the evidence reflects that Hamilton ceased selling the device alleged to infringe upon the '621 patent due to a lack of commercial success, and that the product's failure was a result of a lack of true universality.[22]  Further, the record reflects similar prior art that belies O'Neill's assertions.

Looking to all the appropriate factors, the Court finds that the '621 patent is invalid because the differences between the '621 patent and the prior art - particularly the Snyder patent - are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.  Indeed, the differences between the '621 patent and the prior art are insignificant, the level of ordinary skill in the

_____

[22] See Affidavit of Ilona Thompson; September 26, 2006 Deposition of Bill Priest at 30-31.

art is low, and there are no special considerations that warrant a finding that the '621 patent is not obvious.  Further,  the Court's finding of obviousness in light of Snyder is especially appropriate because the Court has already determined that the dimensions of the "universal" buckle in the '621 patent may be construed only as an assertion of universality. The only material difference between the '621 patent and the Snyder patent are those dimensions, which are meaningless.

## Conclusion

Accordingly, upon due consideration, it is ordered that:

(1) Plaintiff Hamilton Products, Inc.'s Motion for Summary Judgment (Doc. 40) is GRANTED and the Clerk is directed to enter judgment in favor of the Plaintiff and against Defendant Michael C. O'Neill on Count I and Count II of the Complaint;

(2) the Court finds and declares that United States Patent No. 6,834,621 B1 is invalid because the '621 patent is invalid as indefinite and because the claimed invention was obvious;

(3) the Court finds and declares that no product Plaintiff Hamilton Products, Inc. has ever sold infringes upon United States Patent No. 6,834,621 B1 because that patent is invalid;

(4)  Defendant Michael C. O'Neill's Cross Motion for Summary Judgment (Doc. 45) and Amended Counter Motion for Summary Judgment (Doc. 48) are DENIED;[23]

---

[23] On March 26, 2007, O'Neill filed a document entitled "Defendant's Response to Plaintiff's (continued...)

(5) Plaintiff Hamilton Products, Inc.'s Motion to Strike Cross Motion for Summary Judgment (Doc. 47) and Motion to Strike Amended Counter Motion for Summary Judgment (Doc. 51) are DENIED as moot; and

(6) the Clerk is directed to withhold final judgment pending resolution of this case as a whole.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 15th day of June, 2007.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:   Counsel of Record
             Maurya McSheehy

_____

[23](...continued)

Motion for Summary Judgment and Counter-Motion for Summary Judgment" (Doc. 45) and on April 13, 2007 - well outside the dispositive motion deadline set by the Court - O'Neill filed a document entitled "Defendant's Amended Response to Plaintiff's Motion for Summary Judgment and Counter-Motion for Summary Judgment" (Doc. 48). In both of those documents, which can only be interpreted as responses to Hamilton's motion for summary judgment, the Defendant makes numerous first-person, unsworn statements to the Court that are unsupported by other evidence in the record. However, at the conclusion of those documents - which are substantially similar - is the following paragraph:

> O'Neill requests Summary Judgment and ruling that the '621 patent and its claims are valid and that [Hamilton] has infringed O'Neill's patent, and requests judgment in a amount equal to all of the Plaintiff's profits from the sale of the device (to be determined by a certified auditor), plus maximum punitive damages for flagrant and willful misconduct, and intentional infringement.

Doc. 48 at 39. To the extent that O'Neill requests summary judgment on Counts I and II of Hamilton's Complaint, that request is denied for the reasons stated in this Order. In addition, there are no counterclaims in this case by O'Neill against Hamilton. Thus, to the extent that O'Neill seeks damages against Hamilton, that request is also denied.